Filed 3/28/23  Valley Water Management v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VALLEY WATER MANAGEMENT COMPANY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL VALLEY,<br><br>Real Party in Interest and Appellant. | F083744<br><br>(Super. Ct. No. BCV-19-101630)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Eric M. Katz and Jennifer Kalnins Temple, Deputy Attorneys General, for Real Party in Interest and Appellant Regional Water Quality Control Board.

Downey Brand and Melissa A. Thorme for Plaintiff and Respondent Valley Water Management Company.

-ooOoo-

Valley Water Management Company brought this action against the California Regional Water Quality Control Board for the Central Valley Region, challenging beneficial use designations for groundwater in the Tulare Lake Basin. Judgment was entered in favor of Valley Water Management Company. Thereafter, the trial court awarded attorneys' fees to Valley Water Management Company under Code of Civil Procedure section 1021.5. The Regional Water Quality Control Board for the Central Valley Region appealed the trial court's ruling awarding the attorneys' fees. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

This matter was initiated in the Kern County Superior Court by Valley Water Management Company (Valley Water) against California Regional Water Quality Control Board, Central Valley Region (Regional Board or Central Valley Regional Board). More specifically, on June 12, 2019, Valley Water filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the Regional Board, challenging two Regional Board actions by way of traditional mandamus under Code of Civil Procedure section 1085.[1]

### A.    The Regional Board's Tulare Lake Basin Plan Designated Beneficial Uses for Groundwater in the Tulare Lake Basin

Under the 1969 Porter-Cologne Water Quality Control Act (Porter-Cologne Act, Wat. Code, § 13000 et seq.), the state agency charged with formulating and adopting state policy for water quality control within the state is the State Water Resources Control Board (State Board). (Wat. Code, §§ 13140, 13160.) Nine regional water quality boards operate under the purview of the State Board, and the State Board and regional boards are collectively responsible for protecting water quality in the state. (*California Assn. of Sanitation Agencies v. State Water Resources Control Bd.* (2012) 208 Cal.App.4th 1438,

---

[1]    Subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.

3.

1444 (*CASA*).) The State Board establishes statewide policy and plans for water quality control (Wat. Code, §§ 13140, 13170, 13170.2), and the regional boards formulate and adopt water quality control plans (basin plans) for areas within given regions (Wat. Code, § 13240). As relevant here, the Central Valley Regional Board is responsible for protecting and regulating the quality of surface waters and groundwater in the Central Valley through various basin plans, including the Tulare Lake Basin Water Quality Control Plan (Tulare Lake Basin Plan or Basin Plan), which is at issue in this matter.

Basin plans have several elements, including: (1) designating beneficial uses (e.g., agricultural, municipal, and recreational uses) for the waterbody at issue; (2) setting water quality objectives or standards to further the designated beneficial uses; and (3) a program of implementation. (Wat. Code, § 13050, subd. (j); *City of Arcadia v. State Water Resources Control Bd*. (2010) 191 Cal.App.4th 156, 177.) The Tulare Lake Basin Plan was first adopted in 1975 and has been updated and revised 23 times thereafter. This case concerns the Tulare Lake Basin Plan's designation of beneficial uses for groundwaters in the Tulare Lake Basin.

The 1975 Tulare Lake Basin Plan adopted by the Regional Board designated "Present and Potential Beneficial Uses" for the Basin's surface waters and groundwaters. As relevant here, the Tulare Lake Basin Plan blanket-designated groundwaters in the Basin as suitable for, inter alia, municipal (MUN) and agricultural (AGR) uses, with the caveat that "specific beneficial uses of the groundwater [would] be determined at [a later] time."

In 1988, the State Board adopted Resolution No. 88-63, a " 'Sources of Drinking Water Policy,' " in light of a newly enacted law, Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986, which included protections for existing and potential municipal drinking water sources. (Health & Saf. Code, § 25249.5 et seq.) The State Board's Resolution No. 88-63 provided that "[a]ll surface and ground waters of the

4.

State are considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards," subject to certain exceptions.[2]  (Fn. omitted.)

The Central Valley Regional Board incorporated the State Board's Sources of Drinking Water Policy into the Tulare Lake Basin Plan on May 26, 1989.  The Regional Board designated all surface and ground waters within the Basin as potentially suitable for municipal supply, except for waters that, inter alia, had an excessive mineral content, were otherwise contaminated beyond the point of reasonable remediation, or represented an insufficient yield for the purpose of constituting a domestic water supply.  Since then, the Tulare Lake Basin Plan has blanket-designated all groundwaters in the Basin for, inter alia, existing or potential municipal and agricultural use, with certain specifically identified exceptions.  As for municipal use, the Basin Plan states:  "Due to the 'Sources of Drinking Water Policy,' all ground waters are designated MUN (the use may be existing or potential) unless specifically exempted by the Regional Water Board and approved for exemption by the State Water Board."  As for agricultural use, the Basin Plan states:  "In addition, unless otherwise designated by the Regional Water Board, all ground waters in the Region are considered suitable or potentially suitable, at a minimum, for agricultural supply (AGR)."  As mentioned above, the Basin Plan lists specific groundwater areas that are exempted from the blanket MUN and AGR designations.

---

[2]     The State Board's Resolution 88-63 was subsequently determined by the California Office of Administrative Law to be " 'a regulation' " that was "required to be adopted in compliance with the Administrative Procedure Act," but suffered from certain procedural defects.

**B.** **Valley Water Faced a Proposition 65 Lawsuit from Environmental Groups as well as a Cease-and-Desist Order from the Central Valley Regional Board**

Valley Water, a membership organization with oil company members, had operated, for several decades, two interconnected oilfield-produced wastewater disposal ponds collectively referred to as the McKittrick Facility.[3] The Regional Board's brief explains: "The McKittrick Facility served oil producers [that] generated wastewater as a byproduct of their oil extraction operations. Oil wells bring up oil, but the oil is usually mixed with unwanted water. After the useable oil is separated from the water, the produced water, which contains numerous oil related contaminants, requires disposal. Valley Water facilitated such disposal by way of its disposal ponds." Valley Water's McKittrick Facility operated under a permit initially issued by the Regional Board in the 1950s. Under the permit, Valley Water could discharge wastewater into its on-site disposal ponds but was prohibited from creating pollution and/or a nuisance.

California's Proposition 65 prohibits discharges of chemicals known to cause cancer, to sources of drinking water, and authorizes private citizens to bring civil lawsuits to enforce its terms after giving 60 days' notice of intent to file suit. (Health & Saf. Code, §§ 25249.5, 25249.7, subd. (d).) Proposition 65 applies when cancer-causing chemicals are discharged into "any source of drinking water."[4] (Health & Saf. Code, § 25249.5.) Under Proposition 65, a "source of drinking water" is defined as a present source of drinking water or water that is identified in a water quality control plan as being suitable for domestic or municipal uses. (Health & Saf. Code, § 25249.11, subd. (d); Cal. Code Regs., tit. 27, § 25102, subd. (w) ["water" includes both surface and ground

---

[3] "Produced water" is a term of art in the oil industry; it refers to water produced as a byproduct of oil and gas production.

[4] Health and Safety Code section 25249.5 provides: "No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water."

waters].) A court may award up to $2,500 per day of violation of Proposition 65's prohibitions. (Health & Saf. Code, § 25249.7, subd. (b)(1).) On April 15, 2019, two environmental groups gave notice to Valley Water of an intent to file a citizen suit under Proposition 65 seeking potentially millions of dollars in civil penalties for unlawful discharge of pollutants into a source of drinking water.

The environmental groups then filed a Proposition 65 complaint on June 24, 2019, in the Kern County Superior Court (*Clean Water Fund et al. v. Valley Water Management Co.* (Super. Ct. Kern County, BCV-19-101750)), regarding Valley Water's oilfield wastewater discharges to its McKittrick Facility that was subject to the Tulare Lake Basin Plan.[5] The complaint alleged that Valley Water "has been operating since approximately 1955 and has operated in its current configuration with wastewater storage and treatment ponds, and conveyances, such as pipelines or impoundments, since approximately 1980." It further alleged that Valley Water "discharges and/or disposes as much as 4.4 million gallons of wastewater into these pits in a single day, and that on average, [Valley Water] discharges and/or disposes 2.5 million gallons per day." In addition, the complaint alleged that the Regional Board staff, "after investigation, identified discharges from the unlined pits at [Valley Water's] Facility, which have migrated through the soil and caused documented groundwater pollution that has spread past the alluvium and into deeper aquifers. The plume from [Valley Water's] Facility has migrated laterally for miles." Next, the complaint alleged that Valley Water had discharged Proposition 65-listed chemicals into groundwater designated for drinking, and

---

[5] The Regional Board has filed a request asking us to take judicial notice of the complaint in the related Proposition 65 case, pursuant to Evidence Code section 452, subdivision (d). Evidence Code section 452, subdivision (d) permits a court to take judicial notice of the records of any state court. The Regional Board's request is hereby granted. (See *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1191-1192 [court took judicial notice of relevant court documents filed in related matter]; *In re Sodersten* (2007) 146 Cal.App.4th 1163, 1171, fn. 1.)

7.

sought "penalties of $2,500 per day for each violation." The complaint also sought a permanent injunction requiring Valley Water to cease discharging pollutants in violation of Proposition 65.

Around the same time, on June 7, 2019, the Regional Board issued a cease-and-desist order to Valley Water. The cease-and-desist order noted: "The Discharger has generated an oil field produced wastewater plume that … greatly exceeds the quality with respect to [certain minerals and other substances, etc.] required to support the Basin Plan designated beneficial uses of MUN and AGR." The cease-and-desist order required Valley Water to further investigate the extent of the groundwater plume emanating from its facility as identified by the Regional Board. The cease-and-desist order also required Valley Water to cease discharging pollutants to groundwater by September 1, 2020, unless it made operational changes allowing it to obtain a new permit that would be in compliance with the Tulare Lake Basin Plan.

On June 12, 2019, Valley Water initiated the instant lawsuit. Valley Water filed a Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief in the Kern County Superior Court, *seeking to void the Regional Board's beneficial use designations for groundwater* throughout the Tulare Lake Basin as waters potentially suitable for agricultural use and drinking water. More specifically, Valley Water challenged the Regional Board's 1975 action, when it initially adopted the Tulare Lake Basin Plan, to designate groundwater in the Tulare Lake Basin as suitable for agricultural use. Valley Water also challenged the Regional Board's 1989 action to amend the Tulare Lake Basin Plan to incorporate the State Board's " 'Sources of Drinking Water Policy' " (State Board Resolution No. 88-63), whereby groundwater in the Tulare Lake Basin was designated as suitable for use as municipal drinking water, with specific exceptions. By way of these actions, the Regional Board had "blanket

8.

designated" large areas of the Tulare Lake Basin as suitable for both agricultural and municipal use.

On June 28, 2019, Valley Water filed a Petition for Review of the Regional Board's cease-and-desist order with the State Board, in which Valley Water sought, in part, the same relief as it did in the instant writ action. As relevant here, Valley Water contended the cease-and-desist order protected a "non-existent MUN use," as the groundwaters under its facility "should not have been designated [for municipal use] in the first place." (Unnecessary capitalization omitted.) Valley Water further contended that "the initial MUN use designation under and around the Facility where the groundwater was and is not capable of being used for municipal supply[,] was arbitrary, capricious, unsupported by substantial evidence, and, therefore, unlawful." The petition for review requested, inter alia, the following relief: "Valley Water requests that the State Water Board urge the Central Valley Water Board to act with all due haste to correct improperly designated uses of ground water near and below Valley Water's facilities." The petition for review also contained a request that the State Board place the petition for review in abeyance for two years "to allow Valley Water to work with the Regional Board on the issues raised herein." In the meantime, Valley Water pursued the instant lawsuit against the Regional Board.

## C.     The Instant Lawsuit and the Trial Court's Ruling and Judgment

As noted, on June 12, 2019, Valley Water filed the instant lawsuit against the Regional Board. More specifically, Valley Water filed a combined verified petition for writ of mandate pursuant to Code of Civil Procedure section 1085 and complaint for declaratory and injunctive relief. The prayer for relief sought a judicial declaration that the Tulare Lake Basin Plan's beneficial use designations were invalid and/or a writ of mandate directing the Regional Board to invalidate them. In addition, Valley Water sought injunctive relief enjoining the Regional Board from enforcing the designations of

9.

beneficial uses for groundwater in the Basin, specifically: "An order enjoining Defendant Central Valley Regional Board from utilizing and enforcing the improperly and unlawfully designated MUN, AGR, and other non-existent uses complained of herein for groundwater regulated under the Tulare Lake Basin Plan."

On July 8, 2019, Valley Water filed a notice of related case seeking to relate the instant lawsuit to the Proposition 65 case previously filed against it by the environmental groups. On August 9, 2019, the trial court related the cases assigning them both to the Honorable David J. Lampe.

On September 9, 2019, Valley Water filed its operative first amended verified petition for writ of mandate and complaint for declaratory relief (petition/complaint) Valley Water's petition/complaint clarified that Valley Water filed the instant action on account of the enforcement action filed by the environmental groups under Proposition 65 as well as the separate action by the Regional Board. Thus, the petition/complaint asserted, as part of its general factual allegations, that invalidation of the beneficial use designations as to groundwater in the Tulare Lake Basin Plan was necessary because absent such relief, "Valley Water … will be subject to unnecessary enforcement actions by the Central Valley Regional Board and under Proposition 65." The petition/complaint further alleged that in such scenarios, Valley Water "may be required to expend millions of dollars to install additional storage, evaporation, and/or treatment facilities (e.g., micro-filtration/reverse osmosis) that are specific and unique to removing salinity compounds," all of which would "be unnecessary if water quality objectives based on inapplicable beneficial uses (e.g., MUN, AGR, etc.) did not apply."

The petition/complaint specifically noted: "[T]wo non-profit corporations recently filed a Notice of Violation letter against Valley Water on April 15, 2019, *prompting [the instant] litigation* filed on June 12, 2019." (Italics added.) The petition/complaint further noted that the non-profit organizations thereafter "sued Valley Water on June 25th, 2019,

10.

under Proposition 65 … seeking civil penalties and injunctive relief." The petition/complaint added: "Thus, Valley Water has already been harmed and is currently facing unnecessary enforcement actions under Proposition 65 due to the Central Valley Regional Board's inaccurate MUN designation."

On November 6, 2020, the trial court heard the merits of the petition/complaint. On May 14, 2021, after directing Valley Water to prepare a statement of decision and hearing various related objections, the trial court entered judgment in favor of Valley Water, and issued an accompanying statement of decision and peremptory writ of mandate.

The statement of decision summarized the court's ruling at the top:

> "The Court renders judgment for the Petitioner Valley Water Management Company ("Petitioner" or "Valley Water") and against Respondent California Regional Water Quality Control Board for the Central Valley Region ("Respondent" or "Regional Board") upon the First Amended Verified Petition for Writ of Mandate ("Petition") and issues a writ of mandamus limited to requiring the Respondent to initiate and pursue a Basin Plan Amendment process for portions of the Tulare Lake Basin to determine the scope and extent of actual and potential beneficial uses of groundwater *near the Petitioner's McKittrick 1 and 1-3 facilities* ("McKittrick Facilities"), including the propriety and reasonableness of the current designation of municipal drinking water supply ("MUN") and/or agricultural ("AGR") use as to all or any portion of that groundwater.

> "Otherwise, the Court denies the Petition without prejudice to Petitioner's right to seek further proceedings. Also, the Court declines to consider at this time the Petitioner's collateral cause of action for declaratory relief or the collateral remedy of injunction pursuant to the doctrine of judicial abstention, without prejudice to further proceedings upon further order of the Court. (See *Acosta v. Brown* (2013) 213 Cal.App.4th 234.) The Court shall retain continuing equitable jurisdiction for this matter pending a return demonstrating that an amendment process has been initiated and finalized after judgment as necessary.

> "Petitioner is to have judgment for costs incurred. The propriety of an award of attorney's fees can be determined by separate motion and ruling." (Italics added.)

11.

The court discussed its reasoning and ruling in more depth in subsequent sections of its statement of decision. For example, the court clarified that blanket designations of beneficial uses for groundwaters in basin plans is not per se improper, but such blanket designations need further refinement under certain circumstances. Specifically, the court noted:

"Valley Water argues that these 'blanket' designations lack evidentiary support and are improper because they encompass much groundwater that has never been suited and never will be suited for such designations. This issue must be considered in context. While it is literally true that the assignations of beneficial uses here were not based upon individualized factual analyses, it was not unreasonable or entirely lacking in evidentiary support for the Regional Board, as a policy matter, to create a working assumption that the beneficial uses existed or were attainable where it is impractical to list every groundwater formation in the region. This is a sensible approach and ensures that water quality is protected. It is a 'useful tool' for managing the state water quality program, *provided that* there is an established reasonable regulatory process to make adjustments for actual uses.

"This Court recognizes that an MUN and AGR beneficial use may not be appropriate for some of the groundwater covered by the initial blanket designations, including groundwaters affected by Valley Water's discharges. But if the Regional Board or this Court were to invalidate the blanket designated MUN or AGR uses, much of the groundwater in the region might lack any beneficial use designation. Thus, the 'blanket' language represents a reasonable means of protecting the beneficial uses of the groundwaters of the region unless or until the Regional Board has or gains knowledge that such uses do not or likely will not in the future exist in 'individual' groundwater formations, then the use designations must be expeditiously modified. (See *CASA*, 208 Cal.App.4th at 1460-1461 [the Basin Plan 'impose[s] upon the Regional Board an affirmative obligation to determine the factual accuracy of a use previously designated by blanket application …, where such analysis is necessary for rational regulatory action'].) [¶] … [¶]

"The Regional Board has an affirmative continuing obligation to determine the factual accuracy of a use previously designated by blanket application, where such analysis is necessary for rational regulatory action. Here, the Regional Board acknowledges that the groundwater near Valley

12.

Water's discharges at its facilities is not likely suitable for MUN designation[6] … The blanket designation was a reasonable approach to a complex problem; it was also, admittedly, based upon unavailable specific use data, and in some cases, a known falsehood. ([Citation] [record evidence showing that the Regional Board had data indicating that groundwater in many areas was too saline to support drinking water or irrigation uses]….) In addition to [evidence reflected in] the permits the Regional Board issued to Valley Water in the 1950s and 1960s, the record contains several examples of locations where the Regional Board was aware that groundwater was too high in salinity or boron to be able to be used for drinking water or irrigation. [Citation.] Therefore, the Basin Plan explicitly and implicitly charges the Regional Board with the responsibility to correct erroneous designations when circumstances require it, for example, when the Regional Board is considering pursuing monitoring requirements or alleged violations for discharges. (*CASA*, 208 Cal.App.4th at 1461.) Where the Regional Board has evidence that a use may not exist nor likely cannot be feasibly attained, the Regional Board must expeditiously initiate efforts to consider correcting or removing the use designation. (*Ibid.*) If the Regional Board unreasonably fails or refuses to do so, mandamus will lie. (*Ibid.*)

"Here the Regional Board has and previously had evidence … that the underlying groundwater near Valley Water's McKittrick Facilities are unsuitable for MUN or AGR designation.… In order to preserve the reasonableness of its initial overall blanket designations for the entire basin, the Regional Board must initiate a Basin Plan amendment process, where warranted. (*CASA*, 208 Cal.App.4th at 1461 ['[W]here a Regional Board has evidence that a use neither exists nor likely can be feasibly attained, the Regional Board must expeditiously initiate appropriate basin plan amendments to consider dedesignating the use.'].)

As for the writ granted by the trial court, it directed as follows: "In accordance with the Court's Statement of Decision on Petition for Writ of Mandate, dated May 14,

---

**6**   The court was referring here to, inter alia, a Regional Board Staff Report attached to the Board's cease-and-desist order, which report stated on page 22: "The ground water *directly under* the Facility appears to be primarily produced water from the Facility ponds and possibly other Valley Water facilities. This groundwater may be suitable for dedesignation. However, this water is migrating to the northeast into areas where groundwater [is] *not suitable* for dedesignation, because it is of higher quality and is being beneficially used." (Italics added.)

2021, Respondent Regional Water Board shall initiate a basin planning amendment procedure to review the scope and extent of actual and potential beneficial uses of groundwater *near and underlying* the Valley Water Management Company's McKittrick 1 and 1-3 facilities." (Italics added.) The writ further specified: "The Court will not dictate the precise nature or result of this review, but does require that the Regional Board consider all relevant factors, develop a factual record to allow for judicial review of its decision, and explain how its discretion was exercised."

Finally, the trial court judgment noted that Valley Water's petition for writ of mandate was "granted in part," while its causes of action for declaratory and injunctive relief were "denied without prejudice."

**D.    Valley Water's Settlement of the Proposition 65 Case**

As noted above, Valley Water's petition/complaint alleged the Proposition 65 case that sought penalties of $2,500 per day for Proposition 65 violations, was the impetus for Valley Water's instant action against the Regional Board. Valley Water similarly characterized the Proposition 65 case in its present motion for attorney fees: "Valley Water had hoped [the instant] case would have been a tool to avoid further litigation in a related case alleging that Valley Water violated Proposition 65." Valley Water sought, in the instant action, to void the beneficial uses designated for groundwaters throughout the Tulare Lake Basin.

Valley Water ultimately settled the Proposition 65 case by means of a stipulated consent judgment. The plaintiff environmental organizations in the Proposition 65 case filed a memorandum of points and authorities in support of the stipulated consent judgment. The memorandum of points and authorities candidly stated: "[W]hile this Court's tentative ruling in the related case may weigh against a *full* penalty assessment in this case, Plaintiffs allege and can prove violations beyond just discharges to MUN

14.

designated waters, for which the penalty amount is a reasonable settlement compromise." (Emphasis in original.)

Under the stipulated consent judgment, Valley Water settled the Proposition 65 case for a total of $645,000, consisting of $139,000 in civil penalties pursuant to Health and Safety Code section 25249.7, subdivision (b); $481,000 as reimbursement for the plaintiffs' reasonable attorneys' fees, experts' fees, and costs; and $25,000 as an additional settlement payment, to be paid to the Clean Water Fund. Pursuant to the stipulated consent judgment, Valley Water closed down the McKittrick Facilities in 2021.

## E.  Valley Water's Motion for Attorneys' Fees

After entry of judgment in the instant matter, Valley Water filed, on July 20, 2021, a motion seeking attorneys' fees under section 1021.5. Valley Water sought a lodestar amount of $239,479.65 and a multiplier of 1.5, for a total fee award in the amount of $359,219.48. The Regional Board opposed the motion on grounds that Valley Water had not satisfied the statutory criteria for an award of attorneys' fees set forth in section 1021.5. The Regional Board further argued that any award of attorneys' fees should be subject to a negative multiplier given the limited nature of the relief obtained by Valley Water in this matter.

The court issued a final ruling on Valley Water's motion for attorneys' fees on October 6, 2021. The court's barebones ruling, in its entirety, states:

> "The Court grants in part Petitioner/Plaintiff Valley Water Management Company's Motion for Attorneys' Fees, finding Valley Water Management's action has resulted in the enforcement of an important right affecting the public interest, a significant benefit has been conferred on the general public or a large class of persons, private enforcement was necessary and the financial burden of private enforcement was such as to make the award appropriate. (Code Civ. Proc.[,] § 1021.5.) In light of Valley Water Management's failure to obtain relief as to the entire Tulare Lake Basin, as well as the Court's determination that this action did not involve novel or complex issues, the Court declines to award a multiplier as requested. The Court awards the lodestar amount of $239,479.65.

The Regional Board appeals the trial court's award of attorneys' fees to Valley Water.

## **DISCUSSION**

### I.        **Standard of Review**

Section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

"Section 1021.5 provides for court-awarded attorney fees under a private attorney general theory." (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142; see *Serrano v. Priest* (1977) 20 Cal.3d 25.) "[T]he private attorney general doctrine 'rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions .... [Without] some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible.' " (*Baggett v. Gates*, *supra*, 32 Cal.3d at p. 142.) The private attorney general doctrine as codified in section 1021.5 "is an exception to the usual rule that each party bears its own attorney fees." (*Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 449 (*Vosburg*).) "The section acts as an incentive for the pursuit of public interest-related litigation that might otherwise have been too costly to bring." (*Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2015) 238 Cal.App.4th 513, 520-521 (*Yucaipa*); *Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1045 ["where the financial burden is disproportionate, section 1021.5 serves to

16.

underwrite successful litigation that effectuates strong public policy and obtains benefits for a broad class of citizens"].)

Rulings under section 1021.5 are reviewed for abuse of discretion.[7] (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1344.) "The questions are whether the court applied the proper legal standards under section 1021.5 and, if so, whether the result was within the range of the court's discretion [citation], i.e., whether there was a reasonable basis for the decision [citation]." (*Ibid.*; see *Yucaipa*, *supra*, 238 Cal.App.4th at p. 519 ["Although [the abuse of discretion] standard is deferential, a court abuses its discretion where no reasonable basis for the action is shown."]; *Baggett v. Gates*, 32 Cal.3d at p. 143 [" 'discretion may not be exercised whimsically and, accordingly, reversal is appropriate "where no reasonable basis for the action is shown." ' "]; *Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1044 [an attorney fees award under section 1021.5 will "be reversed where ' "it is clearly wrong or has no reasonable basis" ' "]. )

## II. Legal Framework

Under section 1021.5, the private attorney general statute, "[a] superior court may award attorney fees to (1) a successful party in any action (2) that has resulted in the enforcement of an important right affecting the public interest if (3) a significant benefit

---

[7] See, however, *McGuigan v. City of San Diego* (2010) 183 Cal.App.4th 610, 623 ["Where the material facts are undisputed, and the question is how to apply statutory language to a given factual and procedural context, the reviewing court applies a de novo standard of review to the legal determinations made by the trial court."]. But see *Carian v. Department of Fish and Wildlife* (2015) 235 Cal.App.4th 806, 816 ["Even assuming the underlying facts are undisputed, it remains the trial court's duty to consider those facts and the circumstances of the case and exercise its discretion in determining whether the requirements were satisfied for an award of attorney fees under section 1021.5, and we can reverse the court's determination only if there is no reasonable basis for it."].

has been conferred on the general public or a large class of persons,[**8**] (4) private enforcement is necessary because no public entity or official pursued enforcement or litigation, (5) the financial burden of private enforcement is such as to make a fee award appropriate, and (6) in the interests of justice the fees should not be paid out of the recovery." (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 390 (*Robinson*), fn. omitted.)

"As section 1021.5 states the criteria in the conjunctive, each of the statutory criteria must be met to justify a fee award." (*County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 648; *McGuigan v. City of San Diego*, *supra*, 183 Cal.App.4th at p. 623 [" 'Because the statute states the criteria in the conjunctive, each must be satisfied to justify a fee award.' "].)

"The burden of proving the existence of the first five statutory elements listed in *Robinson* is placed on the party requesting attorney fees under section 1021.5." (*Vosburg*, *supra*, 54 Cal.App.5th at p. 450; *Ryan v. California Interscholastic Federation*, *supra*, 94 Cal.App.4th at p. 1045 [same].)

### III. The Trial Court Abused its Discretion in Awarding Attorney Fees Under Section 1021.5

As noted above, here the trial court listed the factors the court must consider in determining whether an award of attorney fees is appropriate under the private attorney general statute, section 1021.5, but the court awarded Valley Water $239,479.65 in

---

**8** "Because the public always has a significant interest in seeing that laws are enforced, it always derives some benefit when illegal private or public conduct is rectified. Nevertheless, the Legislature did not intend to authorize an award of fees under section 1021.5 in every lawsuit enforcing a constitutional or statutory right. [Citations.] The statute specifically provides for an award only when the lawsuit has conferred 'a significant benefit' on 'the general public or a large class of persons.' The trial court must determine the significance of the benefit and the size of the class receiving that benefit by realistically assessing the gains that have resulted in a particular case." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 635.)

18.

attorney fees without *any* discussion or analysis with respect to the application of those factors to the factual and procedural context of this case.

The Regional Board does not contest Valley Water's showings as to the first statutory element (fees may be awarded to successful party) and sixth statutory element (fees may not be paid out of any monetary recovery). Rather, the Regional Board contends that Valley Water "failed to carry its burden to satisfy the remaining four elements." We will focus on the fifth statutory element, that is, whether the financial burden of private enforcement is such as to make a fee award appropriate.

### A.    The "Financial Burden" Element of Section 1021.5

The Regional Board persuasively contends the trial court abused its discretion in awarding Valley Water fees under section 1021.5, because it failed to meet its burden of showing that the costs of the instant lawsuit disproportionately transcended its personal financial interest in the matter. (See *Ryan v. California Interscholastic Federation*, *supra*, 94 Cal.App.4th at pp. 1043-1044, 1047 [holding that the "trial court abused its discretion in awarding Ryan attorney fees under section 1021.5, because he failed meet his burden of showing that … [the costs of his lawsuit] disproportionately transcended his personal [financial] interest in the matter"].)

The financial burden requirement examines " ' "whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys." ' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214 (*Whitley*).) "In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield." (*Id*. at p. 1215.) " ' "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the

19.

matter.' " ' " (*Ibid*.) " 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' " (*Ibid.*; see *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321, fn. 11 ["[Section 1021.5, subd. (b)] focuses not on plaintiffs' abstract personal stake, but on *the financial incentives and burdens* related to bringing suit." (italics added)]; *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 152 (*Collins*) ["The appropriate inquiry is whether the financial burden of the plaintiff's legal victory outweighs the plaintiff's personal financial interest."].)

Significantly, "in assessing the financial burdens and benefits in the context of section 1021.5, we are evaluating incentives rather than outcomes." (*Whitley*, *supra*, 50 Cal.4th at p. 1220.) " ' "[W]e do not look at the plaintiff's *actual* recovery after trial, but instead we consider 'the estimated value of the case at the time the vital litigation decisions were being made.' " [Citation.] The reason for the focus on the plaintiff's expected recovery at the time litigation decisions are being made, is that Code of Civil Procedure section 1021.5 is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation.' " (*Id.* at pp. 1220-1221.)

*Whitley* set out a "method for weighing costs and benefits" of bringing the lawsuit at issue. (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) " 'The trial court must first fix—or at least estimate—the monetary value of the benefits obtained by the successful litigants themselves …. Once the court is able to put some kind of number on the gains actually attained it must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome…. Thus, *if success would yield* … the litigant group … an aggregate of $10,000 but there is only a one-third chance of ultimate victory[,] *they won't proceed*—as a rational matter—unless their litigation costs are substantially less than $3000." (*Ibid.*, italics added; *City of Oakland v. Oakland Police & Fire Retirement*

20.

*System* (2018) 29 Cal.App.5th 688, 700 & fn. 2 ["*Whitley* … requires consideration of the monetary value of the benefits that the successful litigant *reasonably expected to obtain*"]; see *Collins*, *supra*, 205 Cal.App.4th 140, 154-155 & fn. 10 ["The successful litigant's reasonably expected financial benefits are determined by discounting the monetary value of the benefits that the successful litigant reasonably expected at the time the vital litigation decisions were made by the probability of success at the time."].)

" 'After approximating the estimated value of the case at the time the vital litigation decisions were being made, the court must then turn to the costs of the litigation—the legal fees, deposition costs, expert witness fees, etc., which may have been required to bring the case to fruition. … [¶ ] The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case…. [A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.' " (*Whitley*, *supra*, 50 Cal.4th at pp. 1215-1216; *Espejo v. The Copley Press, Inc*. (2017) 13 Cal.App.5th 329, 379 ["trial court … was required to consider the estimated value of the case at the time the vital litigation decisions were being made, rather than plaintiffs' actual recovery, and compare that amount to actual litigation costs"]; *Norberg v. California Coastal Com*. (2013) 221 Cal.App.4th 535, 545 [under § 1021.5, a court must "compare the estimated value of the case at the time the vital litigation decisions were being made, to the costs of the litigation"]; *Collins*, *supra*, 205 Cal.App.4th at p. 154 ["An attorney fee award under section 1021.5 is proper unless the plaintiff's reasonably expected financial benefits exceed by a substantial margin the plaintiff's actual litigation costs."].)

Sufficient financial incentives may exist that preclude an award under section 1021.5 even where the plaintiff seeks no monetary award in the litigation. (*Summit*

21.

*Media, LLC v. City of Los Angeles* (2015) 240 Cal.App.4th 171, 192-194 (*Summit Media*) [rejecting the "dubious proposition that the absence of a monetary award necessarily equates to 'zero' financial benefits"; "[n]ot all cases involve a monetary award" and "*Whitley* [did not] say that a plaintiff's financial incentive must 'direct' "]; see *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 199 (*DiPirro*) [§ 1021.5 attorney fee award not appropriate where manufacturer's in litigation was to avoid the cost of placing warnings on its product].)

### B. Analysis: *Valley Water Did Not Meet its Burden Under* **Whitley**

Valley Water has been operating wastewater disposal facilities for oil companies since the 1950s or 1960s. The Tulare Lake Basin Plan was first adopted in or about 1975, when groundwater in the Tulare Lake Basin was blanket-designated as suitable for agricultural use. In 1989, groundwater in the Tulare Lake Basin was blanket-designated as suitable for use for the municipal drinking water supply. For decades, Valley Water did not undertake any steps to challenge the beneficial use designations for groundwater in the Tulare Lake Basin or around its facilities.

On April 15, 2019, Valley Water received notice that environmental groups intended to file a citizen suit under Proposition 65 seeking potentially millions of dollars in civil penalties for unlawful discharge of pollutants into a source of drinking water. The environmental groups then filed a Proposition 65 complaint on June 24, 2019, targeting Valley Water's oilfield wastewater discharges to its McKittrick Facility that was subject to the Tulare Lake Basin Water Quality Control Plan. The Proposition 65 complaint sought hefty civil penalties ($2,500 per day per violation of Proposition 65) and a permanent injunction requiring Valley Water to cease discharging pollutants in violation of Proposition 65 to groundwater designated as suitable for drinking under a basin plan.

Around the same time, on June 7, 2019, the Regional Board issued a cease-and-desist order to Valley Water. The cease-and-desist order required Valley Water to cease discharging pollutants to groundwater by September 1, 2020, unless it made operational changes allowing it to obtain a new permit that would be in compliance with the Tulare Lake Basin Plan.

In light of these developments, Valley Water initiated the instant lawsuit on June 12, 2019, seeking to void the municipal and agricultural beneficial uses of groundwater throughout the Tulare Lake Basin, which uses were blanket designated in the Basin Plan. To the extent a plume of contaminated groundwater from the McKittrick Facility had migrated down gradient thereof, a voiding of the beneficial use designations throughout the Tulare Lake Basin would have greatly benefitted Valley Water. Valley Water explicitly acknowledged it filed the instant lawsuit on account of the Proposition 65 enforcement action it was facing at the time. Valley Water's petition/complaint noted: "[T]wo non-profit corporations recently filed a Notice of Violation letter against Valley Water on April 15, 2019, *prompting [the instant] litigation* filed on June 12, 2019." (Italics added.) Valley Water moved to relate the two cases, and subsequently acknowledged in its motion for attorney fees that it viewed the instant case as a "tool to avoid further litigation in [the] related case alleging that Valley Water violated Proposition 65."

The Proposition 65 case and the Regional Board's cease-and-desist order posed massive financial risks for Valley Water. Valley Water faced the expensive prospect of upgrading its equipment and facilities and its ability to continue to run its McKittrick Facility was threatened. In addition, the Proposition 65 case raised a very real possibility of millions of dollars of civil penalties being levied against Valley Water. The instant action sought dedesignation of groundwater in the Tulare Lake Basin, which groundwater had been blanket designated for municipal and agricultural use decades earlier.

23.

Dedesignation of this groundwater, including the groundwater under and around the McKittrick Facility, would have provided a complete defense to the Proposition 65 lawsuit and potentially stymied the cease-and-desist order as well. In short, Valley Water's financial interest in bringing the instant lawsuit was enormous. Moreover, in light of *CASA*, *supra*, 208 Cal.App.4th 1438, which the trial court applied in resolving the merits of this matter, Valley Water had every reason to expect it would achieve some success in this lawsuit.

On the other hand, the expected costs of litigation—somewhere in the vicinity of $239,479.65, the attorney fees amount awarded in this matter—were much smaller in magnitude as compared to the potential financial fallout from the Proposition 65 case and cease-and-desist order. Indeed, upon issuance of the trial court's tentative ruling in this matter, Valley Water was able to negotiate reduced penalties and settle the Proposition 65 case (the environmental groups acknowledged they had to "compromise" on the penalties in light of the trial court's tentative ruling).

This record manifestly establishes that Valley Water had a personal financial stake in this litigation that was more than sufficient to warrant its decision to incur significant attorney fees and costs in the vigorous prosecution of the lawsuit. (*Summit Media*, *supra*, 240 Cal.App.4th at pp. 193-194 [if the plaintiff had a "personal financial stake" in the litigation "sufficient to warrant [the] decision to incur significant attorney fees and costs in the vigorous prosecution" of the lawsuit, an award under section 1021.5 is inappropriate].) There was no reasonable basis for the trial court to find otherwise.

In sum, Valley Water did not meet its burden to show the financial burden of bringing the instant lawsuit was disproportionate to its own pecuniary stake in the litigation. It bears mention that Valley Water's brief does not address at all the *Whitley* formula for evaluating the "financial burden" element of section 1021.5; nor did the trial court's ruling granting attorneys' fees do so. We conclude the trial court abused its

24.

discretion in awarding Valley Water $239,479.65 in attorneys' fees.[9] (See *Millview County Water Dist. v. State Water Resources Bd.* (2016) 4 Cal.App.5th 759, 767-769, 773 (with respect to the issue of *financial burden*, "the trial court abuses its discretion in making an award under section 1021.5 when there is no substantial evidence to support the required findings"].)

## DISPOSITION

The trial court's ruling granting Valley Water's motion for attorneys' fees is reversed. The Regional Board is awarded its costs on appeal.

SMITH, J.

WE CONCUR:

FRANSON, Acting P. J.

PEÑA, J.

---

[9]     Given our determination, it is unnecessary for us to consider whether any of the other statutory elements were satisfied; Valley Water would not be entitled to an award even if the other requirements of section 1021.5 were met.

25.